IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

BRUCE KERNER, et al.,
    Plaintiffs,

v.

Case No. 2:04-CV-735
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Terence P. Kemp

TERMINIX INTERNATIONAL
COMPANY, LLC,
    Defendant.

**OPINION AND ORDER**

This matter is before the Court for consideration of the Defendant's Motion for Summary Judgment (Doc. #109) and the Plaintiffs' Motion for Partial Summary Judgment (Doc. #106). For the reasons that follow, the Defendant's motion is granted in part and denied in part and the Plaintiffs' motion is granted in part and denied in part.

**I.**

Plaintiffs, Bruce and Mindy Kerner ["Plaintiffs"] bring this action against Defendant Terminix International Company, LLC ["Defendant" or "Terminix"] for alleged personal injury and property damage arising from the application of insecticides at the Kerner's home in December 2003. This action was originally filed in the Court of Common Pleas for Franklin County, Ohio and was removed to this Court based on diversity of citizenship. 28 U.S.C. §§ 1332, 1441.

Plaintiffs' claims are based on events that occurred in 2003 at the Plaintiffs' home in

Bexley, Ohio[1]. On July 2, 2003, Plaintiff Mindy Kerner requested that Terminix perform pest control treatment for ants located outside Plaintiffs' home and garage. (*Mindy Kerner Declaration* at ¶ 6). Chris Brown[2], a Terminix service technician, performed the service. (*Id.*). On October 16, 2003, Mr. Brown performed an additional, allegedly unsolicited, pest control treatment to the exterior of Plaintiffs' home. (*Id.* at ¶ 7). A copy of the report from this visit included a notation that Plaintiffs should call Terminix as soon as possible because Brown had "located evidence of termites." (*Id.*).

On October 29, 2003, Plaintiff Mindy Kerner entered into a contract with Terminix to perform termite pest control services[3]. (*Id.* at ¶ 8). According to Plaintiff, while performing the termite treatment, Brown and another employee informed Plaintiff that they had just returned from a "huge flea job" prior to arriving at Plaintiffs' home. (*Id.* at ¶ 9). Plaintiffs claim that, after the termite treatment, their home became "severely infested with fleas." Plaintiffs claim to have suffered from flea bites during November and December 2003. (*Id.*)[4]. Plaintiff Mindy Kerner called Terminix on December 1, 2003 to report the alleged infestation. Plaintiffs' home was treated for fleas on December 1, 4, 9 and 12, 2003. (*Id.* at ¶ 10). Plaintiffs claim that shortly after the first treatment on December 1, they experienced chest pain, severe headaches, burning and itching. (*Id.* at ¶ 11). Plaintiffs further claim that after the December 12 treatment, they

---

[1] Plaintiff Bruce Kerner, M.D., is a colorectal surgeon. (*Mindy Kerner Decl.* at ¶ 4).

[2] Mr. Brown has a prior felony conviction. (*Affidavit of Christopher Brown* at ¶ 3). The Court does not decide the issue of admissibility of this information at this juncture because it has no bearing on resolution of the parties' motions for summary judgment.

[3] Specifically, Plaintiffs entered into a "Terminix Termite Baiting System Protection Plan" at a cost of $2,133.93 for one year of services.

[4] Plaintiffs did not have any pets in their home. (*Mindy Kerner Decl.* at ¶ 9).

2

experienced hives, welts, nausea and diarrhea. (*Id.*). On December 15, 2003, Plaintiff Mindy Kerner telephoned Nathan Caulfield, a Terminix service manager who performed the December 12 treatment, and informed him that the Plaintiffs were very ill as a result of the treatment. (*Id.* at ¶ 12). On December 16, 2003, Terminix sent a cleaning crew to Plaintiffs' home to steam clean the upholstery, carpeting and other items that had been sprayed. (*Id.*). .

In his affidavit, Chris Brown states that he accidently brought fleas into the Plaintiffs' home in October 2003. (*Affidavit of Christopher R. Brown* at ¶ 13). By December 2003, Brown had been transferred to a different service area. According to Brown, Terminix employee Shane Hoover treated Plaintiffs' home for the fleas. According to Brown, Hoover was a new employee and had not been adequately trained to treat flea infestation. (*Id.* at ¶¶ 12, 15). Brown further avers that Hoover and others at Terminix were aware that the application of insecticides at Plaintiffs' residence was not in accordance with the labels for the products used. (*Id.* at ¶ 15).

On deposition, Hoover testified that he applied a "baseboard to baseboard" treatment of Tempo Ultra SC throughout the interior of Plaintiffs' home. (*Deposition of Shane Hoover* at 113-14). Hoover acknowledged that Tempo Ultra SC is designed for exterior, not interior, use. (*Id.* at 108). Hoover testified that after receiving a call from Plaintiff on December 1, 2003, he looked to see what insecticide products he had on his truck. Hoover thereafter located the Tempo Ultra SC but misread the label, which stated that it was for exterior, not interior, use. (*Id.* at 126). According to Hoover, he had received no prior training with Tempo Ultra SC before using it at Plaintiffs' home. (*Id.* at 137). Terminix Service Manager, Nathan Caufield, also testified on deposition that Tempo Ultra SC is not intended to be used for indoor flea control. (*Deposition of Nathan Caufield* at 117).

3

Hoover testified that the Tempo Ultra SC was in a powder form and required mixing with water, which Hoover did in the basement of Plaintiffs' home using a sink basin. (*Hoover Depo.* at 128). Hoover did not, however, include an "insect growth regulator" with the mixture because he did not have it on his truck on December 1, 2003. (*Id.* at 130). According to Hoover, an insect growth regulator should be used to inhibit fleas from reproducing. (*Id.* at 129). Hoover testified that Plaintiff Mindy Kerner accompanied him as he applied the insecticide throughout the home. (*Id.* at 132). Hoover also stated that the customer should typically remain outside the home during treatment. (*Id.*). After the second unsuccessful flea treatment at Plaintiffs' home on December 4, 2003[5], Hoover consulted with his supervisor, Mr. Caufield. (*Hoover Depo.* at 140). Caufield suggested use of a different product, IGR, which was used on December 9. (*Id.* at 141). Hoover testified on deposition that he was not aware in December 2003 that the Tempo Ultra SC label directed a seven to ten day waiting period between applications. (*Id.* at 158-59).

Caufield performed the fourth treatment at Plaintiffs' home on December 12, 2003. He used Nylar IGR mixed with Demize EC[6]. (*Deposition of Nathan Caufield* at 129-30). Caufield applied the products to furniture, carpeted surfaces, and mattresses. He also applied the product around the baseboards of Plaintiffs' home. (*Id.* at 129). He used the same treatment on the carpet of Plaintiff Mindy Kerner's automobile, because there were fleas in the back of the car. (*Id.* at 141). On the evening of December 12, 2003, Plaintiff Mindy Kerner called Caufield to

---

[5]Hoover again used Tempo Ultra SC on December 4, 2003. He did not use an insect growth regulator during the treatment. (*Hoover Depo.* at 157-58).

[6]Caufield testified on deposition that he did not consider the effect of a fourth treatment close in time to the prior treatments. (*Caufield Depo.* at 138-39).

4

complain of adverse medical reaction[7]. (*Id.*). Caufield spoke with the Plaintiff again on December 15, 2003 and told her that arrangements would be made to clean Plaintiffs' home. (*Id.* at 143). Caufield informed his branch manager, James Miller, of Plaintiffs' complaint and Miller advised Caufield not to speak with Plaintiff anymore. (*Id.* at 144).

On January 6, 2004, Plaintiff Mindy Kerner filed a complaint with the Ohio Department of Agriculture ["ODA"] regarding Terminix's alleged misapplication of insecticide at Plaintiffs' home. (*Mindy Kerner Decl.* at ¶ 13). The ODA investigated Plaintiff's complaint and, on February 23, 2004, the ODA sent a letter to James Miller of Terminix's Columbus, Ohio office stating that the ODA "is proposing to assess a civil penalty against you for violation(s) of the Ohio Pesticide Law." (Exhibit 6 attached to *Plaintiffs' Motion for Partial Summary Judgment*). Specifically, the ODA concluded that Terminix applied a pesticide inconsistent with labeling, a violation of R.C. § 921.25(Q), and that Terminix failed to notify the ODA within 48 hours of learning of human illness from pesticide activities, in violation of R.C. § 921.25(P) and OAC § 905:5-11-02(E)(1). (*Id.*). Shane Hoover was ultimately reprimanded and suspended for three days for misuse of a product contrary to the label. (*Hoover Depo.* at 143-44).

Plaintiffs' Complaint presents claims for negligence, negligent supervision of employees, negligent misrepresentation, negligence per se, negligent infliction of emotional distress and alleged violation of the Ohio Consumer Sales Practices Act ["OCSPA"], R.C. § 1345.01, *et seq.* Plaintiffs move for partial summary judgment on their claims for negligence *per se* and violation of the OCSPA, as well as the first two elements of their negligence claim. The Defendants

---

[7]In her declaration, Plaintiff Mindy Kerner states that she called Mr. Caufield on December 15, 2003.

5

move for summary judgment on all claims.

## II.

The procedure for considering whether summary judgment is appropriate, is found in Fed. R. Civ. P. 56(c); this section provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158-59 (1970). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also, Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

The United States Court of Appeals for the Sixth Circuit has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identifies a number of important principles in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 257). The nonmoving party must adduce more than a mere scintilla of evidence in order to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita*, 475 U.S. at 586). Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

### III.

### A. Plaintiffs' Negligence Claims.

Under Ohio law, the elements of a cause of action for negligence are: (1) the existence of a legal duty; (2) Defendant's breach of that duty; (3) a resulting injury that is the proximate cause of the Defendant's breach. *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989). The existence of a duty is a question of law for the Court. *Id.* Under Ohio law, a duty arises from the relationship between the parties giving rise to an obligation on the part of the Defendant to exercise due care toward the Plaintiff. *See Asad v. Continental Airlines, Inc.*, 328 F.Supp.2d 772, 781 (N.D. Ohio 2004), citing *Commerce and Industry Ins. Co. v. Toledo*, 45 Ohio St.3d 96, 98 (1989).

The Court finds that Terminix clearly owed a duty to Plaintiffs to exercise due care in performing the services at issue in this case. Plaintiffs claim that Terminix breached this duty by bringing fleas into the Plaintiffs' home and by attempting to abate the infestation by using insecticide products contrary to the labeling directives. The Defendant does not deny that it owed a duty to Plaintiffs but argues that Hoover's testimony that the insecticide was applied contrary to the label does not establish breach of duty as a matter of law. According to Terminix, the label was "contradictory and confusing." (*Defendant's Memorandum contra* at 10). This argument is unsupported by the evidence of record. The label clearly indicates they type of application required for particular uses[8]. (Exhibit 6 attached to *Pl. Motion for Partial Summary Judgment*). Moreover, it is the Defendant's obligation to understand and interpret the label before applying the particular product. The undisputed evidence of record shows that this obligation was not followed. Thus, the Court finds no material issue of fact as to Defendant's breach of duty. The Court concludes that Plaintiffs are entitled to partial summary judgment on the first two elements of their common law negligence claim.

In addition to their claim for common law negligence, Plaintiffs also assert a claim for negligence per se. Under Ohio law, if a statute imposes a duty for the safety of others, failure to perform is negligence per se. *Chambers v. St. Mary's School*, 82 Ohio St.3d 563, 565 (1998). Nevertheless, a Plaintiff must prove proximate cause and damages. *Id.* In this case, Plaintiffs' negligence per se claim is based on Terminix's violation of R.C. § 921.24(A), which prohibits the application or use of a pesticide "inconsistent with the pesticide's labeling, treatment

---

[8]The label clearly identifies "Application for Indoor Pests" as opposed to "Outdoor/Perimeter Pests." Fleas are listed under the heading "Outdoor/Perimeter Pests" not "Indoor Pests." In short, the Defendant used a product that was labeled for use as flea control only in an outside application.

8

standards, or other restrictions imposed by the director of agriculture." Defendant argues that its duty under the statute is not stated with the requisite specificity because the Tempo Ultra SC label is contradictory and confusing. Again, based on the undisputed evidence of record, Defendant's representatives ignored the label prior to application of the insecticides at Plaintiffs' home. Thus, the Court finds that Plaintiffs have successfully established negligence per se.

The Plaintiffs argue that, with respect to the remaining elements of their claims for negligence and negligence per se - - causation and damages - -, genuine issues of material fact exist. The Defendant disagrees and moves for summary judgment on the basis that Plaintiffs cannot establish causation or damages resulting therefrom. In *In re Meridia Products Liability Litigation*, 328 F.Supp.2d 791 (N.D. Ohio 2004), the court held that, in toxic tort cases, the issue of causation is two-pronged: "First, a plaintiff must show that the substance to which she was exposed *can cause* the type of injury alleged. Next, a plaintiff must show that in her case, exposure to the substance *actually caused* the alleged injury." *Id.* at 798 (emphasis in original), citing *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988). The Ohio Supreme Court recently adopted this standard for toxic tort cases in Ohio:

> To present a prima facie case involving an injury caused by exposure to . . . [a] toxic substance, a claimant must establish: (1) that the toxin is capable of causing the medical condition or ailment (general causation), and (2) that the toxic substance in fact caused the claimant's medical condition (specific causation).

*Terry v. Caputo*, 115 Ohio St.3d 351, 355 (2007).

The Defendant contends that Plaintiffs' expert witnesses who will testify on the causation issue fail to provide sufficient opinions as to general or specific causation. In addition, Defendant contends that the experts' opinions on the extent of Plaintiffs' property damage is

9

insufficient. The Court notes that Defendant has filed a Motion *in limine*, challenging Plaintiffs' expert testimony under *Daubert* and Fed. R. Evid. 702. (Doc. #110). The Court will resolve this challenge separately, after the scheduled hearing. At this juncture, the Court will simply consider, whether, if the challenged evidence survives the *Daubert* challenge, there remain genuine issues of material fact on the elements of causation and damages. Thus, the Court cannot make a final ruling on Defendant's Motion for Summary Judgment until after the *Daubert* Hearing.

As noted above, Plaintiffs claim that they suffered physical injury and property damage as a result of Terminix's actions. According to Defendant, the Plaintiffs' experts, Drs. Bernad and Simon, fail to provide a reliable opinion on the issue of general causation because there is allegedly no evidence that Plaintiffs received a toxic dose of insecticide. Defendant also argues that the experts fail to provide reliable opinions on the issue of specific causation. According to Defendant, there is a lack of evidence establishing that Plaintiffs' claimed injuries were caused by exposure to insecticides, as opposed to other possible causes, such as pre-existing physical or mental conditions.

In response, the Plaintiffs assert that their experts' opinions are reliable for purposes of *Daubert* and Fed. R. Evid. 702. Consequently, Plaintiffs contend that genuine issues of material fact exist as to general and specific causation. Drs. Bernad and Simon conclude that Plaintiffs' symptoms are consistent with exposure to the insecticides at issue. As to specific causation, Dr. Bernad's opinion is based on a differential diagnosis, a method under which a physician considers all potential causes of symptoms and eliminates alternative causes based on physical examination, clinical tests and case history. *See Hardyman v. Norfolk & Western Railray Co.*,

243 F.3d 255 (6th Cir. 2001). Defendant takes issue with the experts' opinions because the degree of exposure to particular insecticides was allegedly not quantified[9]. Defendant further challenges the opinions that the insecticides are capable of causing the type of adverse reactions allegedly suffered by Plaintiffs in this case. Similarly, with regard to specific causation, Defendant takes issue with the experts' opinions on differential diagnosis[10].

If Plaintiffs' experts are permitted to offer their opinions, the Court would necessarily conclude that genuine issues of material fact exist as to causation. In the Court's view, these issues can only be resolved in the context of the standards of *Daubert* and Fed. R. Evid. 702. The Court reserves final ruling on Defendant's motion for summary judgment for Plaintiffs' negligence claims until after the *Daubert* hearing.

The Court notes that Plaintiffs raise an issue regarding alleged spoliation of evidence. Plaintiffs take issue with Terminix's decision to send a cleaning crew to Plaintiffs' home following the fourth application of insecticide. According to Plaintiffs, Terminix should have reported Plaintiffs' illness to the ODA and arranged for an environmental survey to assess the

---

[9]A certain level of the insecticides were found in Plaintiffs' HVAC system. Defendant contends, however, that the level of exposure found was less than what the United States Environmental Protection Agency considers a safe level of exposure.

[10]The Court notes that Defendant also contends that Plaintiffs' experts' opinions are unreliable, because Plaintiff Dr. Kerner has represented to various hospitals and medical licensing boards that he is in overall good health. Plaintiffs contend that Defendant mischaracterizes the representations, in that Dr. Kerner has allegedly notified hospitals in writing that he suffers from an impairment because of the exposure but controls it through medication and other accommodations that do not impair his ability to practice medicine.

In its motion for summary judgment, Defendant submits that Plaintiff Dr. Kerner should be judicially estopped from asserting injury claims in view of his representations regarding his health. The Court concludes that the doctrine of judicial estoppel does not apply in this context. *See New Hampshire v. Maine*, 532 U.S. 742 (2001). In the Court's view, Plaintiff's explanation of his health status bears on the Plaintiff's credibility and the extent of his alleged injuries, which are matters for the jury to consider.

11

Plaintiffs' exposure, rather than clean the premises. Plaintiffs state that the issue of alleged spoliation is not raised as a cause of action but rather as an issue regarding the element of causation.

In the Court's view, evidence that the premises were cleaned prior to any testing on the level of exposure bears on the element of causation. As Plaintiffs point out, the Defendant contends that Plaintiffs have failed to show a level of toxic exposure in their home as a result of Defendant's actions. If Defendant is permitted to make such an argument, then Plaintiff must have the opportunity to respond by pointing out that the home was cleaned before any report of the misapplication of insecticide was made. The Court concludes that, whether this is characterized as "spoliation" of evidence or not, it is a matter that is proper for a jury to consider[11].

## B. Plaintiffs' Ohio Consumer Sales Practices Act Claim.

The Ohio Consumer Sales Practices Act ["OCSPA"], R.C. § 1345.01, *et seq.*, protects consumers from suppliers who commit deceptive or unconscionable sales practices. *Richards v. Beechmont Volvo*, 127 Ohio App.3d 188, 1090 (Ohio App. 1st Dist. 1998). A "consumer transaction" includes "a service . . . to an individual for purposes that are primarily personal,

---

[11]Spoliation of evidence is the "intentional destruction of evidence that is presumed to be unfavorable to the party responsible for the destruction." *Beck v. Haik*, 377 F.3d 624, 641 (6th Cir. 2004). The rules that apply to an allegation of spoliation of evidence are governed by state law. *Id.* In Ohio, an allegation may be pursued as an independent cause of action or for sanctions. Plaintiffs do not seek to pursue either in this case. Thus, the Court presumes that, while Plaintiffs characterize the event of cleaning their home as spoliating evidence, they do not seek to prove the elements of a claim for spoliation under Ohio law. Instead, Plaintiffs seek to use the issue of spoliation to bolster their claims regarding the level of toxicity and the issue of causation.

12

family or household, or solicitation to supply any one of these things." R.C. § 1345.01(A). A "supplier" is "a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting consumer transactions . . . ." R.C. § 1345.01(C). A "consumer" is "a person who engages in a consumer transaction with a supplier." R.C. § 1345.01(D).

Plaintiffs contend that providing ineffective pest control treatment, as well as applying pesticides in a manner inconsistent with labeling, amounts to a violation of the OCSPA. Plaintiffs cite *Allied Pest Conrol v. State ex rel. Montgomery*, No. 94-511, slip. op. (Ohio Ct. Common Pleas April 17, 1996), in support of this contention. As Defendant points out, this case holds that a pest control company which represents to consumers that its services are guaranteed or are covered by a warranty, but limits liability to "retreatment only", commits an unfair and deceptive act and practice under the OCSPA. *Id.*, slip. op. at 4-5, (Exhibit 9 attached to *Pl. Motion for Partial Summary Judgment*). It does not appear that Plaintiffs' OCSPA claim in this case is based on a guarantee or warranty limited to retreatment services. Thus, the Court does not find the *Allied Pest Control* case controlling.

According to Defendant, a claim for alleged failure to properly apply a pesticide is not actionable under the OCSPA. Defendant cites *Roelle v. Orkin Exterminating Co., Inc.*, 2004 WL 166485 (Ohio App. 10th Dist. 2000), in support of this assertion. *Roelle* also dealt with a retreatment guarantee for termite infestation. The court concluded that the retreatment guarantee amounted to an unfair or deceptive act or practice in violation of the OCSPA. *Id.* at *7-8. The court also considered whether a separate claim for Orkin's alleged "incompetence" or "ineffectiveness" could constitute an unconscionable act or practice under the OCSPA. The court concluded that Orkin's ineffectiveness in treating the Plaintiffs' home was an integral part

of their warranty claim under the OCSPA. "Without the ineffectual treatment, the [Plaintiffs] would have suffered no damages from the deceptive sales practice; without the deceptive sales practice, the ineffectiveness of the treatment would of itself not be actionable under the terms of the contract." *Id.* at *10. The court found no basis for a separate action based on mere incompetence or ineffectiveness under the OCSPA.

Defendant also cites *Swift v. Allied Pest Control, Inc.*, 2001 WL 992051 (Ohio App. 2nd Dist. 2001), in which Plaintiffs claimed a violation of the OCSPA after pesticide treatment for termites leaked into the Plaintiffs' home, allegedly causing them to suffer various physical ailments. Following a trial, the jury found that the Defendant pest control company knowingly committed an act in violation of the OCSPA but also concluded that the violation was a "bona fide" error. On appeal, the court found it difficult to reconcile the two jury findings and remanded the case. Contrary to Defendant's argument, the Court does not read the *Swift* case as standing for a broad proposition that ineffective pest control treatment is not actionable under the OCSPA[12].

Nevertheless, Plaintiffs also fail to cite a decision to support their theory that ineffective pest control treatment can amount to a violation of the OCSPA. In their reply memorandum, Plaintiffs again rely on the Montgomery Court of Common Pleas decision in *Allied Pest Control, Inc. v. State ex rel. Montgomery*, No. 94-511, slip. op. (Ohio Ct. Common Pleas April 17, 1996), but, as noted above, that case dealt with a claim based upon a warranty offered by the pest control company. Thus, the claim is distinguishable from the claim advanced by Plaintiffs in this

---

[12]Defendant also argues that its actions in this case were, at best, a bona fide error. Such a finding is, however, one for the trier of fact to consider. It would be inappropriate for the Court to reach such a conclusion on summary judgment.

14

case. In the absence of any authority on the issue, the Court concludes that evidence of alleged ineffective treatment fails to support a claim for an unconscionable or deceptive practice under the OCSPA.

The Court does, however, find that evidence of alleged spoliation, *i.e.*, cleaning Plaintiffs' home prior to any analysis as to toxicity levels or reporting to the Ohio Department of Agriculture, gives rise to genuine issues of material fact under the OCSPA. Under R.C. § 1345.02(A), "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." Furthermore, the Court concludes that a genuine issue of material fact exists as to whether Defendant's failure to report Plaintiffs' alleged illness was a deceptive act under the statute. These are matters for a jury to consider. To this limited extent, the Plaintiff's OCSPA claim survives Defendant's Motion for Summary Judgment.

In sum, Plaintiffs' Motion for Partial summary Judgment is granted as to the elements of duty and breach on their negligence claims. The motion is denied in all other respects. The Defendant's Motion for Summary Judgment is granted as to Plaintiffs' OCSPA claim based on ineffective pest control treatment and is denied in all other respects. The Court reserves final ruling on the Defendant's motion as it relates to the negligence claims until after the *Daubert* hearing.

## IV.

The Defendant's Motion for Summary Judgment (**Doc. #109**) and the Plaintiffs' Motion for Partial Summary Judgment (**Doc. #106**) are **GRANTED in part and DENIED in part**, consistent with the foregoing.

**IT IS SO ORDERED.**

\_1-17-2008\_  
**DATE**

_____  
**EDMUND A. SARGUS, JR.**  
**UNITED STATES DISTRICT JUDGE**